# ANDERSON KILL P.C.

Attorneys and Counselors at Law

1251 AVENUE OF THE AMERICAS ■ NEW YORK, NY 10020
TELEPHONE: 212-278-1000 ■ FAX: 212-278-1733
www.andersonkill.com

Samuel M. Braverman, Esq.
SBraverman@AndersonKill.com
Tel. 212-278-1008

April 17, 2023

Re:    *United States v. Dominic Pineda*
Dkt.:   22 Cr 337 (KMK)

Hon. Kenneth M. Karas
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

Dear Judge Karas:

I am counsel for Defendant Dominic Pineda in the above referred to matter and I write to the Court in support of a sentence of no greater than 60 months incarceration, plus post-release supervision, the standard conditions of supervision plus mental health and substance abuse treatment, and a $100 special assessment. He has nothing to his name, so he is unable to pay any fine.

Dominic Pineda was born into tough and outright bad circumstances, and then made some bad decisions to compound his situation. I have long ago stop trying to quantify an individual's history of trauma, to put it on some scale or graph to then argue whether it justified the bad outcomes that followed the input. Everyone's trauma is their own, and their ability to react successfully to that trauma, or to fail to overcome it, must be viewed from their perspective and not ours. To learn about someone's trauma requires empathy, a willingness to listen without judging, and to accept that some facets of another's life will never be comprehendible to us as we don't have the experience to understand it-despite how often we assume that we can. A favorite author of mine wrote "What is essential is invisible to the eye. It is only with the heart that one sees rightly."

Dominic Pineda is my first federal client born in this millennium, and is now merely 21 years old. Although his parents were married when he was born, they separated within a year and divorced soon thereafter due to his father's physical and emotional abuse of his mother. His father was incarcerated for his domestic violence, which creates the confusing dichotomy of engendering feelings of abandonment that the father has left the family *and* relief that the abuser has been removed from the home. The

New York, NY ■ Newark, NJ ■ Philadelphia, PA ■ Washington, DC ■ Stamford, CT ■ Los Angeles, CA ■ Denver, CO ■ Boston, MA

**Anderson Kill P.C.**

February 21, 2023
Page 2

last time Dominic had more than a fleeting interaction with his father was when pre-teen Dominic had to walk miles by himself back to his mother's house, arriving at dusk, because his father was too busy watching television be bothered to take Dominic home. PSR ¶¶ 54-62

Dominic's replacement father figure gave the family two half-brothers, and provided some financial support, but regularly used cocaine and argued often in the home with Dominic's mother. The new couple eventually separated and then were divorced. After separation, the step-father remained in contact with his two biological sons, but gave nothing to Dominic, repeating the abuse/abandonment cycle for Dominic. The step-father is himself now incarcerated awaiting deportation.

Dominic's childhood home was impoverished and, not surprisingly, in an area overrun with drug-dealing and violence-prone gangs. Dominic regularly saw this activity which made him afraid for his safety and that of his family, and as often happens, enticed him to eventually go to the Dark Side. Dominic had five contacts with law enforcement over a 21-month period immediately prior to his arrest in the instant matter. These contacts resulted in one conviction (for possession of a home-assembled firearm) and a suspended sentence. Clearly Dominic was making terrible choices in this period, and his recklessness could have caused real harm. It is not wholly unfair to see the instant matter as the reasonable next stage of criminality given the predecessor events. What might give this Court confidence that the instant matter is the *last* event on the timeline and not merely the *next*?

First, Dominic has accepted responsibility for his criminal conduct in the instant offense, and did so reasonably quickly upon receipt of the discovery. His statement to the Court at the time of the plea, and to probation at the time of his interview, demonstrate that he accepts his role in the offense, understands why it is unacceptable behavior, and he has a goal and a plan so that he never puts himself in this position again. Empathy for victims of crimes is the most essential building block of rehabilitation, far more important that fear of imprisonment or regret for lost opportunities. Empathy teaches us that other people matter, and their needs and rights are as important as our own. "[Dominic] apologized to the victims and expressed regret regarding his association with his co-conspirators. Pineda advised that his family is 'hurt' by his criminal conduct and related that his younger brothers 'need' him. He stated that it has been difficult to adjust to his incarceration and he plans to never return to custody. [He] expressed 'I want to better myself'. He plans to continue his education and added that he would like to start a clothing company and done to others in need. He specified that he wants to do something to help others." PSR ¶ 28.

**Anderson Kill P.C.**

February 21, 2023
Page 3

Second, Dominic is young and has few traits that are immutable. Many a federal defendant comes in at sentencing with a history of repeated prison terms, followed by dramatically short and ineffective periods of supervision. In such circumstances, a court could well believe that the die has been cast and the form is set, and no future changes of personality or habits can be expected. Here we don't have that background. Dominic was in a period of bad behavior, but there were no intervening periods of court activity followed by imprisonment. Perhaps if that had happened, we would not be here. The blame falls on Dominic for not learning from the limited interventions that did happen, but there isn't a good factual predicate for deciding that Dominic is incorrigible. To the contrary, he has done admirably while incarcerated (completing educational programs and being promoted to food service duties at the MDC), and he has not incurred any infractions or loss of privileges. Probation makes the case well-enough that the circumstances of Dominic's life pushed him (without resistance) into a short but significant period of criminal activity. It also concludes that Dominic has the characteristics, the youth, the malleability, and the support of his mother to succeed if given the opportunity. PSR pp. 25-26

Dominic described to Probation his substance abuse of daily marijuana use, which is certainly not uncommon for young men with ADHD, a lack of education or job skills, limited financial prospects, and no guidance from adult role models. Dominic has had some success with mental health treatment, and would likely benefit from substance abuse treatment, and both are recommended by Probation (both in custody and while on supervision) to help Dominic navigate through prison and the transition to civilian life.

Also relevant to this Court's decision are the sentences given to the two co-defendants whose matters have already been resolved: On March 10, 2021, Jeffrey Johnson, who also pled guilty to Count 1 of an identical indictment, was sentenced to 60 months incarceration by Judge Nelson S. Roman. On April 7, 2021, Tyler Allen, who also pled guilty to Count 1 of an identical indictment, was sentenced to 60 months by Judge Roman. Here Dominic's conduct is the same as his codefendants, and although I don't have access to the codefendants' PSR, neither of them could have had much less (or much more) of a criminal history than Dominic, so they do appear to be similarly situated as Dominic. PSR ¶¶ 9-10

Probation calculates the guidelines to reach the same conclusion as the parties that the total offense level is 29, the CCH is I, and the guideline range is 87-108 months. But Probation *sua sponte* recommends a downward variance to 60 months, which it believes satisfies all the sentencing factors under 18 USC §3(a), violates none of the

**Anderson Kill P.C.**

February 21, 2023
Page 4

commandments to "promote respect for the law" or "provide adequate deterrence to the defendant and others", and is "sufficient but not greater than necessary".

The obvious visible impact on Dominic personally is the best evidence of the "general deterrent effect" and the "promote respect for the law" requirements of §3553(a). Beyond imprisonment, segregation from society, and loss of opportunity, there are a host of collateral consequences of conviction. As the Eastern District of New York now includes in their probation reports under the heading "Collateral Consequences of a Felony Conviction:

> As a result of a felony conviction, defendants face a potentially broad range of collateral consequences. Numerous federal and state laws place various restrictions on defendants, many of which attach automatically upon conviction. Some of these collateral consequences include the denial of government benefits, ineligibility for public housing, suspension of student loans, revocation or suspension of driver's licenses, and the inability to enlist in the military, or serve on a jury or to vote. The potential collateral consequences of a felony conviction are numerous and circumstance specific. For further guidance, please see the American Bar Association's website at www.ABACollateralConsequences.org.

For the reasons stated herein, and in the final Probation Sentencing and Investigation Report, I ask the Court to sentence Dominic Pineda to no more than 60 months incarceration, followed by 3 years post release supervision, the standard conditions of supervision plus mental health and substance abuse treatment, a $100 special assessment, and no fine. I thank the Court for its consideration.

Very truly yours,

*Sam Braverman*

Samuel M. Braverman
National Co-Chair
Government Enforcement,
Internal Investigations, and
White-Collar Defense Group

**Anderson Kill P.C.**

February 21, 2023
Page 5