

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States Attorney's Office*
*50 Main Street, Suite 1100*
*White Plains, New York 10606*

April 21, 2023

**BY ECF**

The Honorable Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

     **Re:**    ***United States v. Dominic Pineda*, 22 Cr 337 (KMK)**

Dear Judge Karas:

The Government respectfully submits this letter in advance of the sentencing of the defendant, Dominic Pineda, scheduled for April 25, 2023, at 3 p.m. As described below, the Government respectfully submits that a sentence within the advisory Sentencing Guidelines range of 87 to 108 months' imprisonment would be sufficient, but not greater than necessary, to reflect the seriousness of the defendant's conduct.

As explained below, this case involves extremely serious conduct. The defendant made extensive plans to commit two home invasion robberies, one of which involved a plan to break into a family's home in the middle of the night, tie up and pepper spray the parents, and then beat up and do whatever else was necessary to force a teenager to disclose the code to what the defendant and/or his co-conspirators believed to be tens of millions of dollars in Bitcoin. The defendant and his co-conspirators did not just plan for these actions; they came as close as possible to executing their violent plan and would have successfully done so had they not been thwarted by law enforcement. In fact, a co-conspirator broke one of the victim's windows and climbed into the victim's basement, carrying a backpack containing an imitation firearm, brass knuckles, and a taser. Luckily, the violent plan was thwarted when the victim's security alarm was triggered, but the scheme plainly demonstrates an intent to commit serious violence. A Guidelines sentence is further appropriate to promote respect for the law and to ensure adequate general and specific deterrence.

## A.    Background

On or about May 7, 2020, the defendant and his co-conspirators traveled to Brockton, Massachusetts for the purpose of breaking into an individual's home ("Victim-1") and forcing Victim-1 to provide the code to his/her cryptocurrency, Bitcoin. (ECF No. 26, Presentence Investigation Report "PSR" ¶ 21.) While in Brockton, the defendant and his co-conspirators went

to what they believed to be Victim-1's residence and conducted reconnaissance, taking videos and photographs of the outside of the home, as they searched for evidence of cameras and planned where to break in and how to flee. Ultimately, the defendant and his co-conspirators did not follow through with the planned robbery because they were deterred by police presence in the area. (*Id.*)

Undeterred by their unsuccessful efforts in Brockton, almost immediately after returning home, the defendant and other co-conspirators began planning a second robbery, targeting another individual who contemporaneous news reports claimed had stolen around $24 million in Bitcoin ("Victim-2"). (*See id.* ¶ 15.) Other co-conspirators were recruited to act as getaway drivers, monitor police scanners, and/or participate in the robbery itself. The defendant and his co-conspirators obtained equipment for the planned robbery, which included bulletproof vests, a taser, a pellet gun that resembled a 9mm handgun, brass knuckles, a battering ram, and dark-colored clothing. (PSR ¶¶ 16, 20.)

On or about May 18, 2020, the defendant and a co-conspirator traveled from the Washington D.C. area to Rochester, New York, where they stayed in an Airbnb for several days as they planned the robbery. Over the next several days, the defendant and other co-conspirators went to Victim-2's home in Irvington, New York on several occasions to conduct reconnaissance, looking for security cameras, alarm systems, and doors and windows that they could break into. (*Id.* ¶¶ 17-19.) During one of the reconnaissance operations, some of the co-conspirators remained at the Airbnb to monitor the police scanners and update the others about any police activity. Meanwhile, the defendant and other co-conspirators entered the backyard of Victim-2's home and peered inside, coming close to breaking in, but ultimately deciding that it was too risky given that daylight was breaking. (*Id.* ¶ 19.) The co-conspirators used a cellphone application that allowed them to share voice messages contemporaneously, akin to a walkie-talkie, and further allowed them to program the application so that messages were deleted upon their playback. (*Id.*)

In the days leading up to the planned robbery, the defendant and other co-conspirators had meetings to discuss the planned robbery. Such meetings involved discussing the need to tie up Victim-2's parents and spray them with pepper spray, while using the imitation gun and other weapons to scare Victim-2, beat him/her up, and do whatever else was required until Victim-2 provided the Bitcoin code. (*See id.* ¶¶ 25-26 (referencing plan to "torture" family to get Bitcoin code).)

In the early morning hours of May 23, 2020, the defendant and his co-conspirators decided to finally execute their planned home invasion robbery. As practiced, some co-conspirators remained at the Airbnb to monitor police scanners and inform the others of any police activity. (*Id.* ¶ 20.) Meanwhile, the defendant and other co-conspirators, dressed in dark-colored clothing, packed the equipment, and drove to Victim-2's home. (*Id.*) While in Victim-2's backyard, the defendant and his co-conspirators discussed how to disable the home's alarm without triggering it, and further discussed where and when to break into Victim-2's home. (*Id.*) One co-conspirator broke a window and snuck into Victim-2's basement. (*Id.*) Another co-conspirators cut the cord to Victim-2's security system, which triggered an alarm, causing individuals in Victim-2's home to wake up and call 911. (*See id.*) The co-conspirator who entered the basement became trapped, while the defendant and other co-conspirators fled. (*See id.*) Ultimately, law enforcement was

able to respond to Victim-2's home quickly and found and arrested the co-conspirators who were in Victim-2's basement and in the vicinity of Victim-2's home. (*Id.*)

Shortly after the attempted robbery, law enforcement found a backpack that was left in Victim-2's basement. Inside the backpack was a taser, a pellet gun resembling a 9mm handgun, and brass knuckles. (*Id.*) Law enforcement subsequently found and searched the car that the defendant and his co-conspirators used to drive to Victim-2's home. Inside the car was a battering ram, bulletproof vests, two cans of pepper spray, and a flashlight. (*See id.*) It was later determined that the defendant was in possession of a real firearm at the time of the attempted robbery. (*Id.*)

On June 14, 2022, the defendant was indicted for conspiring to commit a Hobbs Act robbery from at least in or about May 18, 2022 to on or about May 23, 2020, in violation of Title 18, United States Code, Section 1951. (*Id.* ¶¶ 1-2; ECF No. 2.) On January 6, 2023, without a plea agreement, the defendant appeared before Magistrate Judge Andrew E. Krause and allocuted to his criminal conduct charged in the indictment. (PSR ¶ 4.)

## B.  The Government's Pimentel Letter and Guidelines Calculation

On or about November 11, 2022, pursuant to the suggestion of the Court in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), the Government submitted a letter to the defendant, setting forth the Government's position regarding the application of the United States Sentencing Guidelines ("Guidelines") to the defendant. (PSR ¶ 5.) As stated in the *Pimentel* letter, the applicable Guidelines sentence is 87 to 108 months' imprisonment, based on an offense level of 29 and a criminal history category of I. (*Id.*)

## C.  Presentence Investigation Report and Probation's Recommended Sentence

The United States Probation Office ("Probation") generally agrees with the Government's calculation of the applicable Guidelines, concluding that the applicable Guidelines sentence is 87 to 108 months' imprisonment, based on an offense level of 29 and a criminal history category of I. (*Id.* ¶ 93.) In so calculating, Probation identified criminal history that was not included in the information available to the Government when drafting the *Pimentel* letter (*see id.* ¶¶ 44-45), but ultimately that did not impact the defendant's criminal history category.

## D.  The Defendant's Submission

The defendant's sentencing submission (ECF No. 31) principally asserts that the defendant's childhood was difficult, his criminal history is not extensive, he accepted responsibility quickly upon receipt of the discovery in this case, and that he should receive a sentence of no greater than 60 months' incarceration because his co-coconspirators who were sentenced by District Judge Nelson Román—Tyler Allen and Jeffrey Johnson—each received sentences of 60 months' incarceration. (*Id.*; *see also* PSR ¶¶ 9-10.)

## E.  Discussion

### 1.  Applicable Law

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2.  A Guidelines Sentence Is Appropriate in This Case

The Government respectfully submits that a sentence within the advisory Guidelines range of 87 to 108 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.  In particular, the nature and circumstances of the offense, the need to promote respect for the law, and the need to assure both general and specific deterrence, all justify such a sentence.

As described above, the nature of the defendant's conduct is incredibly serious, involving extensive planning and the intent to commit two violent home invasion robberies within the span of a few weeks.  The defendant and his co-conspirators began by specifically identifying and targeting individuals who they believed had millions of dollars of Bitcoin.  They then arranged to

travel significant distances with the intent to break into the homes of their identified victims. In the first instance, the defendant traveled out-of-state from the Washington D.C. area to Massachusetts, and in the second instance, he again traveled out-of-state to Irvington, New York. Thereafter, the defendant and his co-conspirators spent multiple days scouting their targeted locations, visiting each of the families' homes multiple times, and taking photographs and videos. This reconnaissance allowed the defendant and his co-conspirators to best plan where they could break in and whether there were security systems that they needed to avoid or disable. For the second planned robbery, the defendant and his co-conspirators conducted their reconnaissance during both the day (so that they could have the best view of the home and its surrounding area), and the night (so that they could assess what conditions would be like at the time of the actual robbery). And their plans included not only how to break into their victims' homes, but the violence they would inflict once inside. Specifically, in connection with the second planned robbery, the defendant and his co-conspirators had meetings where they discussed plans to tie up Victim-2's parents and spray them with pepper spray. Meanwhile, they planned to beat up Victim-2 and do whatever was necessary to force Victim-2 to divulge the code to his/her Bitcoin.

And particularly troubling is that the defendant and his co-conspirators did not just discuss and prepare for their crimes, they came incredibly close to accomplishing their violent goals. After extensive preparations, they went to Victim-2's home around 3 a.m., wearing dark-colored clothing and carrying their equipment. They had co-conspirators monitor the police scanner and provide updates on any police activity, and they maintained constant contact with one another through their messaging application. And a co-conspirator actually broke one of Victim-2's windows and climbed inside Victim-2's basement, all while carrying a backpack filled with dangerous instruments, including a taser, brass knuckles, and an imitation firearm. If not for the triggered alarm and Victim-2's family being awakened, the defendant and his co-conspirators were fully prepared to execute on the plan to commit serious violence to force Victim-2 to provide the code to his/her Bitcoin.

Although law enforcement was able to thwart the defendant and his co-conspirators before they could fully execute their plan, their conduct nonetheless has had serious consequences. As described in the Presentence Investigation Report, the defendant and his co-conspirator's actions have significantly traumatized Victim-2 and his/her family, including young children who were in the home on the morning of the break-in. (PSR ¶¶ 24-26.) Not only did the family experience significant trauma when they were awakened in the middle of the night to learn that someone had broken into their basement, but the attempted robbery has continued to negatively impact the entire family. The defendant's actions have fundamentally altered the family's sense of safety in their own home, family members have suffered from insomnia, and if a noise is heard at night, the children wake up in tears out of fright. (*Id.* ¶ 26.)

The need for both specific and general deterrence further support a Guidelines sentence. With respect to specific deterrence, the defendant's willingness to plan out and attempt to execute two serious robberies within the span of a couple of weeks is troubling. With respect to general deterrence, a Guidelines sentence is appropriate to send the message to others that planning out and attempting to execute violent robberies will lead to serious sentences of imprisonment. In particular, the Government is aware of other individuals who have been the targets of other similar

robberies focused on obtaining Bitcoin, and accordingly a serious sentence of imprisonment here can serve to deter further similar crimes.

### 3.  The Defendant's Submission Does Not Justify a Below-Guidelines Sentence

The defendant asks the Court to impose a sentence substantially below the Guidelines because his criminal history is not extensive, he accepted responsibility quickly upon receipt of the discovery in this case, and two of his co-conspirators each received sentences of 60 months' incarceration.  Although these are factors that the Court can consider in imposing a sentence, the Government respectfully submits that they do not justify imposing a below-Guidelines sentence in this case given the serious nature of the defendant's conduct.

With respect to the defendant's criminal history, the Government respectfully submits that while the defendant does not have an extensive criminal history, his actions in this case show a clear intent to commit serious violence that is deserving of a serious sentence of imprisonment, and the Guidelines appropriately account for his criminal history.  While the defendant may not have been the ultimate mastermind of the plan to break into two different people's homes and violently rob them of their Bitcoin, his desire and ability to implement this plan could not have been clearer.  As described above, the defendant was an active participant in the many stages of planning, including multiple rounds of reconnaissance.  Ultimately, the defendant and his co-conspirators were in position to fully execute the plan and very easily could have done so had Victim-2's security alarm not been triggered.

The Government recognizes that the defendant had a difficult childhood and has suffered with substance abuse issues, and he accepted responsibility before a trial date was even set, but the Government respectfully submits that the seriousness of the defendant's conduct significantly outweighs these other factors, and a below-Guidelines sentence is not appropriate here.

Finally, a Guidelines sentence is appropriate to reduce sentencing disparities amongst defendants convicted of Hobbs Act conspiracies.  Although two of the defendant's co-conspirators have received sentences of 60 months' incarceration, the Government respectfully submits that such sentences are too low in light of the serious conduct that occurred in this case, and should not be imposed here.

* * * * *

**F. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 87 to 108 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/ Kingdar Prussien
    Kingdar Prussien
    Assistant United States Attorney
    (914) 993-1927

cc:  Sam Braverman, Esq.